382 So.2d 577 (1979)
J. B. HUBBARD, alias James Billy Hubbard, alias John Barney Hubbard
v.
STATE.
6 Div. 715.
Court of Criminal Appeals of Alabama.
May 1, 1979.
After Remandment June 5, 1979.
Rehearing Denied June 26, 1979.
*580 Ralph C. Burroughs, Public Defender, Walter P. Crownover of Crownover, Mountain & Lowther, Joel L. Sogol, Tuscaloosa, for appellant.
William J. Baxley, Atty. Gen., James F. Hampton, Asst. Atty. Gen., for the State.
BOWEN, Judge.
The defendant was indicted in a two count indictment under the Alabama Death Penalty Act for "[a]ny murder committed by a defendant who has been convicted of murder in the first or second degree in the 20 years preceding the crime". Code of Alabama 1975, § 13-11-2(a)(13). Count one charged first degree murder with the prior conviction. Count two charged second degree murder with the prior conviction.[1]
A jury found the defendant "guilty of murder in the first degree with aggravated circumstances as charged in count one of the indictment and fix his punishment at death". We find the verdict to be responsive to the indictment and consistent with the principles set forth in Ex Parte Clements, 370 So.2d 723 (Ala.1979). At trial and on appeal the defendant is represented by the Public Defender's Office of Tuscaloosa County.
The defendant was convicted in 1957 for second degree murder and sentenced to fifty years' imprisonment. He was released in October of 1976 "on the good time law". Since his release from prison the defendant had been living with Mrs. Lillian Montgomery at her house and store.
Shortly after 8:00 on the morning of January 10, 1977, an ambulance arrived at the Montgomery Store on Highway 82 in Tuscaloosa, Alabama. The defendant, who had telephoned the police department, was standing in a side door and signaled the ambulance attendants to come into the kitchen. There Mrs. Montgomery lay dead on the floor having been shot three times with her own .38 caliber pistol. At the scene the defendant told the police that "he and Mrs. Montgomery had been in the upstairs bedroom arguing, that she'd went downstairs and he had heard what he thought were two shots" about 7:00 that morning. The pistol and a one-half pint *581 bottle of Cabin Hollow whiskey were found on the defendant after he told a police officer that he had the weapon. Nitrate tests revealed a small amount of powder residue on both of the defendant's hands and on the right hand of the deceased. The presence of the residue indicates that the test subject has recently fired a weapon or has handled a weapon that has recently been fired.
At police headquarters the defendant gave a statement in which he indicated that Mrs. Montgomery committed suicide.

I
Initially the defendant contends that his prior conviction for murder in the second degree is void because at that trial he was represented by incompetent counsel. To support this allegation the defendant states (1) that his trial counsel was laboring under a conflict of interests and (2) that counsel was incompetent in the handling of his appeal.

A

Competency of 1957 Trial Counsel
The defendant was convicted for murder in the second degree in 1957. The essence of the claim of incompetent counsel is that trial counsel, Hon. James Marshall, represented both the defendant and his father-in-law, Divid Hubbard, who also had been indicted for the same murder. Although Divid was an eyewitness to the shooting in which the defendant claimed self-defense, he was not called to testify in the defendant's behalf.
In 1962 the defendant filed a petition for writ of error coram nobis in the Circuit Court of Tuscaloosa County. A hearing was held on this matter and the defendant was represented by court appointed counsel. On February 15, 1963, in denying the petition, the trial court entered a lengthy order and finding of facts. After summarizing the testimony of each witness the court stated its findings, portions of which we now set forth.
"Following the lengthy hearing in this case or cause, held on January 28, 1963, the Court makes the following findings of facts, and conclusions of law, based on the allegations of the petitioner, and the testimony and evidence offered at the coram nobis hearing, said findings and conclusions being as follows:
"In the first instance, the petitioner and his family for a very substantial sum of money, to-wit, One Thousand ($1,000.00) Dollars, retained the services of Hon. James Marshall, a member of the Tuscaloosa County Bar Association, who the Court finds to have been a very well experienced in handling all aspects of the practice of law, and particularly criminal defense, including defense of defendants charged with the offense of murder in the first degree, that said attorney was diligent, resourceful and able, both in investigation and preparation of the petitioner's original case and in the trial thereof."

* * * * * *
"The Court finds Divit Hubbard was an eye witness and that he testified in this coram nobis hearing to the effect that at the time of the fatal shooting of the victim by the petitioner, the victim was unarmed, that he heard no threat from the victim to the petitioner uttered, and that he saw no sign of any provocation for the shooting. Thus, the Court finds that Mr. Marshall was wise in not using Mr. Divit Hubbard's testimony in the original case, since it would have been very hurtful to the defense of the petitioner.
"The Court finds further that since at the time of the trial of the petitioner in the original case the said, Divit Hubbard, was also charged with the murder of this same victim, he could not have been required to testify in petitioner's trial, and that the said Divit Hubbard could not reasonably have been expected to testify in petitioner's case due to the possibility of self incrimination.
"The Court finds further that when the petitioner signed his name to a dismissal *582 of his appeal, he clearly and well understood what he was doing.
"The Court further finds that the petitioner through his witnesses and evidence presented in this coram nobis hearing showed nothing which was new or which had been unknown at the time of the original trial, but that, conversely, his own witnesses at this said coram nobis hearing made the case against him even stronger on the date of said hearing than at the original trial.
"The Court finds in conclusion that at all times after commission of the said crime the petitioner has received both fair and equitable treatment and has in no instance been deprived of any right accorded and afforded to him either by common law, legislative act, the Constitution of Alabama, the Constitution of the United States of America, or of any other right of which this Court knows or has been informed or had brought to its attention.
"This Court further finds that petitioner's court appointed counsel at the coram nobis hearing, rendered a thorough and complete service to the petitioner, and that petitioner was most adequately represented at the coram nobis hearing, and the Court hereby commends the Honorable Walter Flowers for his services, these services being rendered without any remuneration from any source whatsoever."
On December 19, 1968, the defendant filed a second petition for writ of error coram nobis before the Circuit Court of Tuscaloosa County wherein he alleged that "he was not properly represented by counsel and that his attorney stated to the court that he had never tried a murder case and that he did not know much about criminal cases". Counsel was again appointed to represent the appellant.
On March 25, 1969, the District Attorney filed a motion to dismiss alleging that this second petition did not disclose any different grounds from those stated in the first petition and that all the matters alleged in the second petition were covered in the first.[2]
On March 25, 1969, a hearing was held on this petition. The appellant was present, was represented by appointed counsel and had witnesses testify in his behalf. After having heard the testimony, Presiding Circuit Judge Aubrey Dominick entered an order and judgment of the court. After reciting the evidence presented Judge Dominick found:
"Petitioner did not show and could not show any new ground or grounds which had not been given in support of the Petition for Writ of Error Coram Nobis than given on said trial on January 28, 1963.
"The Court is of the further opinion that no new or different grounds in this Petition have been shown or indicated by Petitioner or his attorney which would in any material respect be new evidence or different from that evidence presented in the hearing before Judge W. C. Warren on January 28, 1963, being Case No. 7891-A in the Circuit Court of Tuscaloosa County, Alabama, and in which case a written Order and Judgment of the Court was made and entered and is in the court file and signed by Judge W. C. Warren on February 15, 1963, since the Court had taken the matter under advisement after the trial on January 28, 1963."
Thereupon the court denied the petition and granted the State's motion to dismiss under Supreme Court Rule 50, Code of Alabama 1940, Volume 3, 1967 Cumulative Supplement.[3] This judgment of the Circuit Court was affirmed by this Court without opinion *583 on June 16, 1970, on authority of Supreme Court Rule 50 and Nolan v. State, 43 Ala.App. 711, 199 So.2d 178 (1967).
In the case now under review a pretrial hearing was held on the issue of attorney Marshall's alleged incompetence. The facts there presented fully support, and do not contradict, the findings of Judge Warren. At the conclusion of the hearing the trial judge ruled that the defendant's 1957 conviction was admissible.
"I find from the evidence presented here and based on the findings not only of Judge Warren but also Judge Dominick that defendant was rendered assistant and competent counsel within the meaning of the case I don't have the case, it's a very recent case where they go into this in Alabama, where the Court of Appeals talked about it, and I get it from that that the standard still gone under is the farce or mockery test. And I find that this trial was not rendered into a farce or mockery or assuming that Mr. Hubbard rendered assistance and effective counsel as ruled by Judge Warren who had a full blown hearing with all the facts involved and also by Judge Dominick. So, I will rule that the conviction will be admissible."
The appellant's argument that "(t)he refusal of Mr. Marshall to allow the co-defendant to testify, regardless of what he might have said, coupled with the co-defendant's subsequent acquittal, show that J. B. Hubbard's defense was neglected for that of his co-defendant" is totally lacking in merit. "(I)n some cases multiple defendants can appropriately be represented by one attorney." Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978). Joint representation is not per se violative of constitutional guarantees of effective assistance of counsel. Holloway, 98 S.Ct. at 1178. "The mere fact that an attorney represents multiple defendants does not establish ineffective assistance. Actual prejudice must be shown." Haggard v. State, 550 F.2d 1019 (5th Cir. 1977). However it is clear that a defendant's Sixth Amendment right to the effective assistance of counsel may be denied where one attorney represents two co-defendants whose interests are in conflict. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).
Here any suspicion which may have surrounded Attorney Marshall's representation of two co-defendants has been erased by the evidence and testimony. We conclude and the record fully supports our finding that Attorney Marshall had no conflict of interest in representing both the defendant and a co-defendant and that the defendant was represented by competent counsel at his trial for murder in 1957.

B

Competency of Counsel on Appeal
The defendant was convicted for second degree murder on October 10, 1957. His appeal was dismissed on November 18, 1957. Attorney Marshall testified in the pretrial hearing held in this case that the appeal was dismissed because "we couldn't get the transcript" because the defendant "didn't have the money". Marshall testified that he "did not discuss his (defendant's) being an indigent and that possibly the State would pay for it".
"Q. Now, at anytime did you advise him or did you discuss with him the possibility of him appealing as an indigent?
"A. No, I don't recallI don't think we even fooled with that at that time, if a man didn't have the money at that time he just"

* * * * * *
"A. Well, I did not discuss his being an indigent and that possibly the State would pay for it."

* * * * * *
"A. I'd never heard of such a thing at that time."

* * * * * *
"A. I don't know that it was in existence or not."

* * * * * *
*584 "Q. All right. Did you look into or research any equal protection arguments as to the denial of a transcript to an indigent?
"A. I did not."
Approximately one and one-half years prior to the dismissal of the defendant's appeal the United States Supreme Court decided the case of Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (April 23, 1956), holding that an indigent defendant could not be deprived of his right to appeal simply because he could not afford to pay for the transcript of his trial.
It is beyond dispute that an indigent defendant has a constitutional right to appeal and to have competent representation on appeal. Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). An indigent defendant also has a right to be informed of his opportunity to appeal, Haggard v. State, 550 F.2d 1019, 1023 (5th Cir. 1977), and has a constitutional right to a free transcript on appeal. Griffin, supra; Pate v. Holman, 341 F.2d 764 (5th Cir. 1965).
The Fifth Circuit Federal Court of Appeals dealt with an identical issue in Malone v. State, 514 F.2d 77 (5th Cir.), cert. denied, 423 U.S. 990, 96 S.Ct. 403, 46 L.Ed.2d 309 (1975). Malone sought an "out-of-time" appeal by petition for writ of error coram nobis. His petition complained that he was denied rights guaranteed to him by the Fifth, Sixth and Fourteenth Amendments because (1) his retained counsel failed either to prosecute an appeal on his behalf or, knowing that he was indigent, to advise him of his right to appeal with the assistance of court appointed counsel; and (2) the state trial court neglected to inform him of his right to an indigent appeal with assistance of court appointed counsel. Recognizing that an indigent defendant has a constitutional right to appeal and to have competent representation on appeal, the court recounted its decision in Pate v. Holman, 341 F.2d 764, 775, modified on other grounds, 343 F.2d 546 (5th Cir. 1965).
"Putting the cases together, we extract the following principles as controlling:
At this point in the development of the law, an indigent's right to appellate counsel, which Douglas recognizes as an `absolute' right guaranteed under both the Equal Protection Clause and the Due Process Clause, is not absolute in the sense that the right to trial counsel is absolute. It is not necessary that the trial judge initiate action toward the appointment of appellate counsel by advising a convicted person of his rights or by making any inquiry as to his indigency, although such minimal action at the time of sentencing seems highly desirable. Compare the right of a defendant in a federal court under Rule 37(a)(2), Fed.R.Crim.P. For a petitioner to be entitled to post-conviction relief, it is not enough to show that indigency occasioned the petitioner's inability to employ counsel or to appeal; the petitioner must show that the State deprived him of his Fourteenth Amendment rights. State action is shown when a responsible official in the State's system of justice rejects a request for counsel or fails to take proper steps toward appointment of counsel for a convicted defendant when he has knowledge of the defendant's indigency and desire for appellate counsel. When an accused person retains counsel on the original trial, the State may rely on the presumption that the accused's lawyer will protect his client's rights on appeal. But that presumption is rebuttable." (Emphasis added)
The court then addressed the issue of whether the State denied Malone effective assistance of counsel.
"It is clear that neither the Alabama trial court nor any responsible state official knew or should have known of Malone's retained counsel's failure to inform his client of his right to appeal in forma pauperis with court-appointed counsel or that counsel's decision to drop (in effect) the appeal was against his client's will. Thuskeeping in mind that Malone's counsel was retainedin order to find state action we must find that the conduct of his counsel was `so grossly deficient *585 as to render the proceedings fundamentally unfair.' Fitzgerald, supra, 505 F.2d at 1337. This we cannot do in light of our holding in Postel v. Beto, supra, that a retained counsel's failure to appeal for sentencing, or to appeal or advise his client of his right to appeal (at all, not just in forma pauperis with retained counsel) does not operate to deny him fundamental fairness."
In Postel v. Beto, 508 F.2d 679 (5th Cir. 1975), the petitioner argued that he was denied his right to appeal since his retained counsel was not present at sentencing and failed to advise him of this right.
"It is the settled rule in this Court that the failure of the state trial court to advise a convicted defendant of his right to appeal is no violation of constitutional rights unless it knows or has reason to know that he wishes to appeal and knows or has reason to know that he is an indigent. Johnson v. Wainwright, 5 Cir., 1972, 456 F.2d 1200; Beto v. Martin, 5 Cir., 1968, 396 F.2d 432; Worts v. Dutton, 5 Cir., 1968, 395 F.2d 341. Neither of these two conditions were met.
"Petitioner's second ground for appeal is the claim of ineffectiveness of his retained counsel by his failure to appear for sentencing and advise petitioner of his right to appeal. As this inescapably involved the question of state action for errors or omission of retained counsel this case has been held pending our en banc decision in Fitzgerald v. Estelle, 5 Cir., 1974, 505 F.2d 1334. In line with the holding in this case we have carefully examined the record and determined that the District Court had ample basis for concluding that the actions of retained counsel did not operate to deprive the trial of fundamental fairness as required by the Fourteenth Amendment and that he was not less than reasonably effective in violation of the Sixth Amendment."
Thus it is clear that establishing the denial of the Sixth Amendment right to counsel where the defendant has retained counsel requires a showing either that counsel performed so poorly as to render the proceedings fundamentally unfair, or that counsel's conduct fell short of reasonably effective assistance and some responsible government official connected with the criminal proceeding, who could have remedied the conduct, failed in his duty to accord justice to the accused. Ballard v. Blackburn, 583 F.2d 159 (5th Cir. 1978); United States v. Childs, 571 F.2d 315 (5th Cir. 1975); Fitzgerald v. Estelle, 505 F.2d 1334 (5th Cir. 1975); Daniels v. Alabama, 487 F.2d 887 (5th Cir. 1973). Neither requirement has been satisfied in the case under review.
The defendant's argument that the mere failure of retained counsel to advise an appellant who alleges he was indigent at the time of his conviction of his right to appeal in forma pauperis constitutes incompetence and a violation of the defendant's constitutional rights as a matter of law has been rejected by the Fifth Circuit Court of Appeals. Langford v. Alabama, 422 F.2d 760 (1970); Fitzgerald v. Estelle, 505 F.2d 1334 (1975). Counsel's effectiveness must be judged by "the norms of representation prevailing at the time of counsel's action". Bonds v. Wainwright, 579 F.2d 317 (5th Cir. 1978). Even as late as 1961, the Supreme Court of Alabama expressed uncertainty regarding the import of Griffin v. Illinois, supra, and refused to grant an appellant a free transcript of his trial. In dismissing the appeal because the record was not timely filed the Court noted:
"We, of course, are familiar with the case of Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, but are not sure of the exact meaning of the sum total of the opinions in the case or their impact upon such a state as Alabama, which has no department or institution with funds from which this Court or any other court could order payment of the expenses of the transcript of the evidence for the appellant. Perhaps Illinois had such a statutory system whereby the Supreme Court of the United States could justify its judgment in ordering the Supreme Court of Illinois to have a transcript prepared for defendant Griffin. But Alabama has no such statute and there is no fund in any department of the *586 state from which such expenses can be paid. Of consequence of which we can not, and will not, order anyone to prepare a transcript of the evidence for this appellant."
Bland v. State, 272 Ala. 215, 130 So.2d 385 (1961).
In 1961 the Alabama Legislature formally responded to the rights announced in Griffin with the passage of what is now Sections 12-22-190 to XX-XX-XXX, Code 1975, providing a record on appeal for indigents. A search of the official case reports of this state reveals no instance where an appellant was provided a free transcript of his trial before the passage of this act.
In view of the attitude of the Alabama Supreme Court to Griffin v. Illinois, supra, as expressed in Bland, supra, we do not think that Attorney Marshall's failure to advise the defendant of his right to a free transcript on appeal constituted ineffective assistance of counsel.
We further note that in the order and judgment of the circuit court entered on February 15, 1963, in the coram nobis hearing, Judge Warren made the following finding of facts with regard to the dismissal of the defendant's appeal.
"The petitioner, J. B. Hubbard, testified in his own behalf and sought to show. . . that the attorney caused an appeal by the petitioner to be dismissed by the petitioner by mistake or inadvertence by not making it clear to petitioner what he was signing or doing and the consequences of his action."

* * * * * *
"Also called as a witness in this cause was Hon. James Marshall, attorney for the petitioner in the original case. Petitioner sought to show by this witness . . . that he caused the petitioner's appeal to be dismissed without the petitioner being sufficiently apprised of his action to know clearly what he was doing by his action of dismissal.
"The State of Alabama sought to prove by Hon. James Marshall that the petitioner was well and adequately represented by his attorney in the defense of a senseless and aggravated murder under circumstances which allowed for very little defense; . . . and, that the petitioner asked that the appeal be dismissed and that the petitioner well and clearly understood that the appeal was being dismissed; and, that in his judgment, there was no aspect of the original trial which would have been sufficient ground for reversal of the original case."

* * * * * *
"The Court finds further that when the petitioner signed his name to a dismissal of his appeal, he clearly and well understood what he was doing."
Other than inadequate representation involving the failure to call certain witnesses and the matter concerning the dismissal of the appeal, we have no record of any allegation by the appellant that his original conviction is due to be reversed on any other ground. The appellant has been given two hearings on the merits of each error alleged to have occurred during his trial. While not so holding we note that, where a petition for writ of coram nobis is treated in effect as a statutory appeal, the error of failing to inform petitioner of his right to appeal is rendered harmless. Haggard, 550 F.2d at 1023.
Based on the above, we find that the defendant was not denied effective assistance of counsel at trial or on appeal of his 1957 conviction for second degree murder. Therefore his 1957 conviction for second degree murder is valid and was properly admitted into evidence in his trial in 1977.

II
The constitutionality of the Alabama Death Penalty Act, Code of Alabama 1975, Sections 13-11-1 through 13-11-9 was declared and upheld in Jacobs v. State, 361 So.2d 607 (Ala.Cr.App.1977), affirmed, 361 So.2d 640 (Ala.1978).

A.
In Prothro v. State, 370 So.2d 740 (Ala.Cr.App.1979), this Court rejected the defendant's *587 argument that the Alabama Death Penalty Act violates the holding of United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), in that it tends to discourage an assertion of the right not to plead guilty and to deter exercise of the right to demand a jury trial.
"Stated otherwise, no provision of the Alabama Act, when considered with other statutory law of Alabama, can have the effect `to discourage assertion of the Fifth Amendment right not to plead guilty and [or] to deter exercise of the Sixth Amendment right to demand a jury trial' as was held in Jackson, supra, 390 U.S. 581, 88 S.Ct. 1209. In the case before us, defendant had nothing to gain by pleading guilty or attempting to waive a jury trial, or both."

B.
In Wilson v. State, 371 So.2d 932 (Ala.Cr.App.1978), this Court answered the defendant's contention that Section 13-11-2(a)(13) is unconstitutional. That section states:
"(a) If the jury finds the defendant guilty, it shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation, which must also be averred in the indictment, and which offenses so charged with said aggravation shall not include any lesser offenses:"

* * * * * *
"(13) Any murder committed by a defendant who has been convicted of murder in the first or second degree in the 20 years preceding the crime;"
In Wilson we wrote:
"The well settled weight of authority dictates that a statute providing that the punishment for an offender shall be increased if he has previously been convicted is not an ex post facto law because applied where the previous conviction or convictions took place before its enactment. Gryger v. Burke, 334 U.S. 728, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948); Bailey v. State, 211 Ala. 667, 101 So. 546 (1924); and cases cited in 16A C.J.S. Constitutional Law § 450, p. 161, n. 52. Such statutes and other enhanced-sentence laws, including recidivist statutes, have been sustained on several occasions against contentions that they violate constitutional strictures dealing with double jeopardy, ex post facto laws, cruel and unusual punishment, due process, equal protection, and privileges and immunities. Spencer v. State of Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); Moore v. State of Missouri, 159 U.S. 673, 16 S.Ct. 179, 40 L.Ed. 301 (1895); McDonald v. Commonwealth of Massachusetts, 180 U.S. 311, 21 S.Ct. 389, 45 L.Ed. 542 (1901); Graham v. State of West Virginia, 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912); Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).
"Statutes which authorize the infliction of a more severe penalty on one who is a persistent offender
"`do not create or define a new, separate, distinct, independent or substantive offense. Further, the statutes do not inflict additional or further punishment for the commission of the prior offense, or offenses, or impose a new sentence for the prior offense, or operate in any way as punishment (for the prior offense), or affect the punishment inflicted therefor, or serve as a basis for trying accused again for that offense; the punishment is for the new crime only, or for only the last or latest offense committed.' 24B C.J.S. Criminal Law § 1958, pp. 431-433 (citations omitted).
"Furthermore, unless provided by statute, in order to authorize the infliction of a more severe penalty on conviction for a second or a subsequent offense, it is not necessary that the first conviction, or other prior convictions relied on, should have occurred subsequent to the enactment of the statute. 24B C.J.S. Criminal Law § 1960(5)a, p. 465. Unless the statute fixes a maximum time limit within which the prior conviction shall have occurred, the remoteness of that prior conviction is immaterial. 24B C.J.S. Criminal Law § 1960(5)a, p. 466.

*588 "Under the above authorities the trial court was correct in overruling the appellant's demurrer to the indictment presenting these grounds."

C.
The defendant also argues that Section 13-11-2(a)(13) is unconstitutional because it, in effect, authorizes capital punishment for the noncapital offense of second degree murder.
In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 2922-2932, 49 L.Ed.2d 859 (1976), the United States Supreme Court specifically held that "the punishment of death does not invariably violate the Constitution". The court considered specifically whether the sentence of death for the crime of murder is a per se violation of the Eighth and Fourteenth Amendments to the Constitution and concluded that "the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe." 96 S.Ct. 2931. The court further noted:
"Finally, we must consider whether the punishment of death is disproportionate in relation to the crime for which it is imposed. There is no question that death as a punishment is unique in its severity and irrevocability. Furman v. Georgia, 408 U.S. [238], at 286-291, 92 S.Ct. [2726], at 2750-2753, [33 L.Ed.2d 346] (Brennan, J., concurring); id., at 306, 92 S.Ct., at 2760 (Stewart, J., concurring). When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed. Powell v. Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1932); Reid v. Covert, 354 U.S. 1, 77, 77 S.Ct. 1222, 1262, 1 L.Ed.2d 1148 (1957) (Harlan, J., concurring in result). But we are concerned here only with the imposition of capital punishment for the crime of murder, and when a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes." Gregg, 96 S.Ct. at 2931-2932.
The argument of the defendant ignores the fact that there is no constitutional barrier to the imposition of the death penalty for a single act of murder. Gregg, supra. In addition, the defendant was indicted and convicted not simply for "an intentional killing" but for an offense involving first degree murder. Most of the aggravated offenses created by Alabama's Death Penalty Act involve an "intentional killing" rather than first degree murder. In Ex Parte Clements, 370 So.2d 723 (Ala.1979), the Alabama Supreme Court affirmed this Court's holding that under Section 13-11-2(a)(2) the indictment need not charge that the killing was done "`unlawfully and intentionally and with malice aforethought'" during the commission of a robbery as the statute only requires an "intentional killing".
We have studied the case of Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), wherein the United States Supreme Court held that a sentence of death for the crime of rape of an adult woman is grossly disproportionate and excessive punishment forbidden by the Eighth Amendment as cruel and unusual punishment. Applying the principles set forth therein we do not find that the death penalty is cruel and unusual punishment for the aggravated offense defined by Section 13-11-2(a)(13).

D.
The defendant also contends that Section 13-11-2(a)(13) is constitutionally infirm because it constitutes a denial of equal protection of the law in that the twenty year period of that section is arbitrary.
The rules by which classification for the purpose of legislation must be tested as against the equal protection clause are stated concisely and clearly in Wilkey v. State ex rel. Smith, 244 Ala. 568, 582, 14 So.2d 536, 549, cert. denied, 320 U.S. 787, 64 S.Ct. 195, 88 L.Ed. 473 (1943) (quoting from Lindsley v. Natural Carbonic Gas Company, 220 U.S. 61, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)):
*589 "`1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids which is done only when it is without any reasonable basis, and therefore, is purely arbitrary.
"`2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality.
"`3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.
"`4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.'"
The equal protection and arbitrariness questions posed by the defendant are somewhat difficult to answer in view of the total absence of legislative history. Thus it is impossible to determine what actually motivated enactment of the twenty year period. Hence we are forced to identify the purpose that the statute in fact serves, and presume a legislative intent to serve that purpose.
The statute was obviously enacted with a view to the protection of society from a certain class of criminal with the belief that a hardened criminal needed more severe punishment than a first offender. Such statutes which enhance sentence are not violative of the due process clause, Graham v. West Virginia, 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912); Moore v. Missouri, 159 U.S. 673, 16 S.Ct. 179, 40 L.Ed. 301 (1895), and do not create an unreasonable classification. McDonald v. Massachusetts, 180 U.S. 311, 21 S.Ct. 389, 45 L.Ed. 542. Generally see 58 A.L.R. 20 (1929); 82 A.L.R. 345 (1933); 116 A.L.R. 209 (1938); 132 A.L.R. 91 (1941); 139 A.L.R. 673 (1942).
The term arbitrary is generally defined as "willful and unreasoning action, without consideration and regard for the facts and circumstances presented". 6 C.J.S. Arbitrary, p. 144 (1975); Van Antwerp v. Board of Com'rs, 217 Ala. 201, 206, 115 So. 239 (1928). A legislative classification is not an "arbitrary classification" if based on substantially different circumstances and reasonably calculated to carry out a proper legislative purpose. Campbell v. State, 12 Wash.2d 459, 122 P.2d 458, 463-464 (1942). An "arbitrary classification" does not exist if any state of facts can reasonably be conceived that would sustain it. Fox v. Rosewell, 55 Ill.App.3d 860, 13 Ill.Dec. 570, 574, 371 N.E.2d 287, 291 (1977). The equal protection clause of the federal constitution is directed only against "arbitrary discrimination", that is, discrimination without any reasonable basis. Verreault v. City of Lewiston, 150 Me. 67, 104 A.2d 538 (1954).
The essence of the theory of equal protection of the laws is that all similarly situated be treated alike. City of Hueytown v. Jiffy Chek Co. of Alabama, 342 So.2d 761 (Ala.1977). Classification of subjects in a statute is not arbitrary and invalid if based on some difference which bears a reasonable and just relation to the attempted classification. Board of Com'rs of City of Mobile v. Orr, 181 Ala. 308, 61 So. 920 (1913).
We do not think it unreasonable to suggest that the legislature, faced with enacting the death penalty laws for this state, reasoned that it is not every prior conviction for murder which upon a subsequent conviction should be subject to the death penalty but only those which occur within a limited period of time. Indeed it could be argued that the very act of instituting the twenty year period was an affirmative and reasoned approach rather than merely including any prior conviction. Considering society's right to be protected from the depravity of the criminally inclined and the duty of the government to secure to its citizens the enjoyment of their lives and property against the unlawful aggression of *590 the criminal class, we conclude that the classification is not unreasonable or arbitrary. Merely because the legislature could have created a different classification does not make the present one arbitrary.

III
Moreover, we do not think that the section deprives the appellant of due process of law because it requires the use of a prior conviction in the indictment. A similar issue was presented in Wilson, supra.
"The appellant maintains that since the jury in a capital case is only advisory and the judge must find the aggravating circumstances before sentencing a prisoner to die, there is no logical purpose for the statutory requirement that the indictment allege the prior conviction or that the state be required to present proof of a prior conviction to a jury.
"In Alabama, by statute, the aggravating circumstance must be alleged in the indictment where the death penalty is sought. § 13-11-1, Code of Alabama 1975. The aggravating circumstances must be set forth in the indictment because the state is required to give the accused notice that a greater penalty is sought to be inflicted than for a first offense. It is fundamental that the accused must be advised and informed of the nature and extent of the offense with which he is charged.
"Under the Death Penalty Statute, the aggravating circumstance is a statutory element of the crime. Without it, one could not be charged and convicted for `capital murder'. Though the opinion of the jury is advisory only upon the trial judge (see Jacobs v. State, 361 So.2d 607 (Ala.Cr.App., 1977)) the state must prove the aggravating circumstances and the jury must find the existence of such even though the enhanced punishment is left to be imposed by the trial judge. By statute,
"`If the jury finds the defendant guilty of one of the aggravated offenses listed in section 13-11-2 and fixes the punishment at death, the court shall thereupon hold a hearing to aid the court to determine whether or not the court will sentence the defendant to death or to life imprisonment without parole.' § 13-11-3, Code of Alabama 1975. (Emphasis added)
"Thus it is clear that the statutory scheme contemplates that the issue of the aggravation of the offense will be submitted to the jury. In the case under review, the state must establish beyond a reasonable doubt (1) the fact of the former conviction of murder in the twenty years preceding the crime (§ 13-11-2(a)(13)) or that the murder conviction carried a life sentence which the defendant was under at the time of the crime (§ 13-11-2(a)(6)) and (2) the fact of the identity of the accused as the person previously convicted.
"Additionally, while the aggravated offense must be proved beyond a reasonable doubt, and according to established rules of evidence, the aggravating circumstances which the trial judge must consider need not be admissible under the exclusionary rules of evidence. § 13-11-3.
"In Williams v. State, 239 Ala. 296, 297, 195 So. 213 (1940), the Alabama Supreme Court addressed this same criticism with regard to a death penalty statute (Title 14, § 319, Code of Alabama 1940). Although the jury fixed the punishment in that statute and does not in the present Death Penalty Statute, we think that the comments are applicable in this case.
"`It is further insisted this charge of being a life convict at the time when he is accused of murder in the first degree should not appear in the indictment to go to the jury, nor evidence in support thereof presented to the jury because of bias or prejudice aroused in the minds of the jury. It is suggested this matter should be brought to the attention of the court alone, and if found to be true, the jury be instructed to inflict the death penalty if found guilty of murder in the first degree. This suggestion should be addressed to the Legislature rather than the courts.'"
*591 In Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), the United States Supreme Court held that due process does not prevent the individual states from enacting habitual offender statutes and from admitting evidence during trial tending to prove allegations of the prior offense required under the statutory scheme. A two stage trial is not required.
Additionally the trial court instructed the jury on the effect of such evidence:
"And I charge you the fact if you find it to be a fact that the defendant has previously been convicted of murder in the second degree it's only to be considered by you as one of the elements alleged in the indictment and not, as to whether or not he is guilty or innocent on the occasion complained of now."
Consequently we find no denial of due process by the use of the prior conviction.

IV
The defendant argues that he "never consented to a search and never relinquished his expectation of privacy from government intrusion into his home". Both the State and the defendant recognize that if the search was valid it must have been conducted with the defendant's consent, no other exception to the warrant requirement being applicable.
The facts are not disputed. Sometime after the homicide the defendant, according to his own statement, telephoned three people, one of whom was his mother. He told each "what Lillian had done" and each told him to call an ambulance, though one told him to call the police. The defendant then
"call the operator and she told me to call the police headquarters and she dialed them for me, I told her it was an emergency. The police department answered and said they would send the ambulance right on out there."
When the ambulance arrived the defendant was standing in the back door of the store and residence and motioned to the ambulance attendants. The attendants entered the store and found Mrs. Montgomery dead on the kitchen floor. Attendant Freeman asked the defendant if he had moved or touched anything and the defendant responded that he had "carried the gun upstairs". The defendant then voluntarily went with Freeman and sat in the ambulance. Upon leaving the store Freeman pulled the door shut and it locked.
In "a couple of minutes" the police arrived. Inside the ambulance and in the defendant's presence, Officer Manley talked with the attendants. After Freeman said that he had locked the door Manley asked the defendant where the key was. The defendant stated that he had it and handed the key to Officer Manley.
Officer Manley then unlocked the store. When the coroner arrived he and another officer searched the store-residence.
That afternoon, after the defendant had given a statement at police headquarters and an autopsy had revealed that Mrs. Montgomery had been shot three times instead of just twice as originally suspected, another officer returned to the Montgomery Store and retrieved the third shell casing from a wastepaper can in the upstairs bedroom.
At the outset we recognize that there is no "murder scene" exception to the rule that all searches without a valid warrant are unreasonable. Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).
The question of whether a consent to search is voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 2047-2048, 36 L.Ed.2d 854 (1973). Examining the facts in this case we conclude that the defendant did, in fact, consent to the search and that the search was not unreasonable. The totality of the circumstances indicates more than a mere submission to police authority which would be insufficient to establishing the requisite voluntariness for consenting to a search. Herriott v. State, 337 So.2d 165 (Ala.Cr.App.), cert. denied, 337 So.2d 171 (Ala. 1976).
*592 At the pretrial hearing the defendant presented no evidence that his consent was involuntary. The evidence revealed that although he had been drinking he was not drunk. The defendant voluntarily gave the keys to the police and never once protested the search or his treatment at the scene. There is absolutely no evidence of deception or coercion exercised by the police in obtaining the keys. There is not even any evidence that the police demanded the keys but only that Officer Manley asked the defendant where the keys were. The defendant made several statements at the scene and made another statement at police headquarters. He freely admitted possession of the murder weapon (although he claimed that Mrs. Montgomery had shot herself) and the fact that he had taken the pistol upstairs after the shooting and removed "two empty shells out of and put two more bullets in it". He told the police that he had placed the empty shells in the trash. Following the homicide, the defendant gave every appearance of cooperating with the police though claiming that the killing was suicide.
The defendant was no novitiate to the police or the criminal justice system. Prior to his trial, he filed at least one pleading (motion for a change of venue) and made various motions. The record contains numerous letters from the defendant to the circuit clerk and the trial judge. Early in the record the trial judge made the remark "of course J.B. (the defendant) you know as much about the law as I imagine I do".
The whole tenor of the defendant's conduct is one of cooperation with the willingness to aid the police. When the defendant gave the keys to Officer Manley he had previously told an ambulance attendant that he had carried the pistol upstairs. When Officer Manley first arrived he talked with the attendant in the defendant's presence. Under these circumstances, and in the absence of any conflicting evidence, it is reasonable to conclude that when the defendant handed the keys to the police officer he voluntarily relinquished all expectation of privacy. Although the case of Knight v. State, 50 Ala.App. 39, 276 So.2d 624, cert. denied, 290 Ala. 368, 276 So.2d 628 (1973), can be distinguished on its facts from the present case, we think that in principle they are the same. It is clear that the consent to search may be given on actions alone. Burrell v. State, 45 Ala.App. 664, 235 So.2d 913 (1970). In Burrell this Court held that where the defendant volunteered the whereabouts of a gun, there simply was no search and hence no warrant was required. 45 Ala.App. at 666, 235 So.2d 913. Here the defendant told the police where two shell casings were. The third casing was also in that same exact location. Consequently we uphold the search without a warrant as reasonable pursuant to the consent of the defendant.

V
The defendant contends that the trial court committed error in admitting into evidence, over objection, testimony concerning a third spent cartridge or shell casing which the court had ruled was inadmissible due to an improper search and seizure.
In our opinion the third cartridge was admissible as the officers had the defendant's consent to search. Therefore there was no error in the admission of the testimony. Even if error were present we fail to see how the admission of the shell casing itself or testimony about it could have injured or prejudiced the defendant under the circumstances of this case.

VI
During the post-trial hearing on the aggravating and mitigating circumstances, the State elicited testimony from Officer Dempsey Marcum that when the defendant was "booked" following his arrest a watch and a number of checks belonging to the deceased were found in his possession. Officer Marcum stated that at the time the watch was taken from the defendant, the defendant stated that Mrs. Montgomery told him after she shot herself that she wanted him to have the watch.
The defendant contends that the failure of the State to reveal the existence of this *593 statement prior to the time it was elicited was violative of his Fifth and Fourteenth Amendment rights. The relevant portion of the defendant's pretrial discovery motion which was granted by the trial court concerned "written or recorded statements or a summary of any statement made by Defendant or copies of such statements or any oral statement made by Defendant to any person, whether reduced in writing or not, which the State may introduce at trial". Neither the oral statement nor the fact that the watch was found in the possession of the defendant following Mrs. Montgomery's death was introduced into evidence at trial.
From the record it is clear that the prosecutor first learned of the statement made by the defendant to Officer Marcum while Marcum was testifying on the witness stand at the sentencing hearing. Marcum testified that he did not reduce this statement to writing. On cross examination he was asked if he considered the statement unimportant to the case at the time it was made. He replied:
"As far as the money and the watch, it was not introduced as evidence, and robbery was not a motive for anything, so I didn't."
Inasmuch as the oral statement was not introduced at trial it was outside the scope of the discovery motion which was limited to statements "which the State may introduce at trial". Therefore the State's failure to produce it was not error. United States v. Wells, 525 F.2d 974 (5th Cir. 1976); Thigpen v. State, 355 So.2d 392 (Ala.Cr.App.), affirmed, 355 So.2d 400 (Ala.1977); Lewis v. State, 335 So.2d 426 (Ala.Cr.App.), cert. denied, 335 So.2d 429 (Ala.1975).
We do not consider the defendant's statements exculpatory. Testimony presented at the sentencing hearing revealed that the deceased always wore the watch, that the watch band was broken, and that the watch was appraised between $400 and $500. The testimony also revealed that found on the defendant's person were a number of checks made out to the deceased. The defendant made no statement as to how he came into possession of the checks.
Expert testimony at trial revealed that one bullet shattered Mrs. Montgomery's jaw and made enunciation "very, very difficult if not impossible". Another bullet pierced her brain and caused "instant death".
Under these circumstances the State's failure to produce the oral statement of the defendant was not error.

VII

Sentencing Hearing

A.
At the hearing on the aggravating and mitigating circumstances defense counsel attempted to introduce the testimony of several of the trial jurors that they would have voted to sentence the defendant to life without parole had that verdict been available to them. The trial judge ruled that such evidence was immaterial and irrelevant.
"It's the ruling of the Court that the feeling of the jury, of course, in that regard is not relevant to the testimony in the proceeding, and that their verdict was only advisory. As I told them, the final decision would have to be made by me after the evidence was produced at this hearing, so it's my ruling that that evidence would be immaterial and irrelevant to this proceeding, and that is my ruling, but I did want to allow you to make an offer showing the proof, so that you could raise it on the record on appeal."
The judgment of the trial court is correct. The rule in this regard is clearly stated in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978):
"(T)he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."
Lockett, 98 S.Ct. at 2965.
In a footnote to this last quoted sentence the court stated:

*594 "Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record or the circumstances of his offense."
Lockett, 98 S.Ct. at 2965, fn. 12.
The application of the principles enunciated in Lockett, supra, to Alabama's sentencing scheme in death cases is found in Jacobs v. State, 361 So.2d at 652-654 (Ala.1978).
Alabama's Death Penalty Act does not permit the jury to exercise any discretion in fixing punishment. Jacobs v. State, 361 So.2d 640, 641 (Ala.1978). The opinion of a trial juror after having convicted the defendant and fixed his punishment at death has no bearing on the defendant's "character, prior record or the circumstances of his offense". The jury "is not provided with guidelines to aid it in fixing the punishment" and "is not the body which finally determines which murderers must die and which must not". Jacobs, 361 So.2d at 643-644. That function is exclusively vested in the trial judge after a hearing has been held to consider the aggravating and mitigating circumstances. Since the jury does not consider such circumstances in reaching its decision we do not consider a juror's opinion to be relevant or material to the decision which the sentencing judge must reach. The difficult task of sentencing a defendant to death or life imprisonment without parole must be made by the trial judge. What someone else would do should have no effect upon his decision. Therefore the trial judge was without error in refusing to consider the opinions of the trial jurors.

B.
The trial judge indicated that he did not know anything about the facts involved in the defendant's first conviction and sustained the State's objection to "that argument". This was proper.
We recognize the principle that
"(w)here sentencing discretion is granted, it generally has been agreed that the sentencing judge's `possession of the fullest information possible concerning the defendant's life and characteristics' is `[h]ighly relevant if not essential[to the], selection of an appropriate sentence . . .'."
Williams v. New York, supra, 337 U.S. at 247, 69 S.Ct. [1079,] at 1083 [, 93 L.Ed. 1337] (emphasis added).
Lockett, 98 S.Ct. at 2964.
However to permit a defendant, as a matter of right, to argue the facts of his prior conviction, except in the most exceptional cases, would result in a retrial of the original and prior conviction. Such would exceed and overextend the purposes of the sentencing hearing and result in a proliferation and ensnarlment of issues immaterial to the original sentencing hearing.
Moreover from the record it appears that defense counsel wanted to once again present evidence on "the legal aspects of the attorney involved and things like that". This matter was fully explored at a pretrial hearing. The defendant's allegations of incompetent counsel at his original trial were found to be without merit. Such allegations were used by defense counsel to attack the validity and ultimately the admissibility of the defendant's 1957 conviction.
We do not think that the sentencing hearing should serve the function of a hearing on a petition for writ of error coram nobis. Once having litigated this very issue before the same judge who conducted the sentencing hearing, and a determination having been made that the allegations were without merit, the defendant had no right to relitigate the same issue and argue contentions which had already been determined to be without factual support. In conclusion, the argument that the court failed "to consider the validity of the prior murder conviction in 1957" is without merit since the court had already considered the issue and found the conviction to be valid.

C.
Alabama Code 1975, Section 13-11-4, requires that:
"If the court imposes a sentence of death, it shall set forth in writing, as the basis *595 for the sentence of death, findings of fact from the trial and the sentencing hearing, which shall at least include the following:
(1) One or more of the aggravating circumstances enumerated in section 13-11-6, which it finds exists in the case and which it finds sufficient to support the sentence of death; and
(2) Any of the mitigating circumstances enumerated in section 13-11-7 which it finds insufficient to outweigh the aggravating circumstances."
For the sake of clarity we set forth the entire order of the court sentencing the defendant to death.

"ORDER OF THE COURT"
"In accordance with law, the Court held a hearing on October 28, 1977, to determine whether or not the Defendant would be sentenced to death in accordance with the verdict of the jury or be sentenced to life imprisonment without parole.
"The Defendant was present with his attorneys, Honorable Ralph C. Burroughs, the Public Defender for Tuscaloosa County, and Honorable Joel Sogol and Honorable Joel Chandler, Assistant Public Defenders for Tuscaloosa County. The State of Alabama was represented by Honorable Tommy Smith and Honorable Bruce Maddox, both Deputy District Attorneys.
"Evidence was offered by the State and Defendant, and both sides were permitted to present argument as to whether the Jury's verdict should be accepted by the Court.
"The Court finds from all of the evidence and the Jury's verdict that the Defendant was guilty and is guilty; and as stated at the presentation of the Jury Verdict, the Court adjudged the Defendant guilty of Murder in the First Degree with aggravating circumstances as charged in Count I of the Indictment.
"The Court finds that the capital felony of Murder in the First Degree with aggravating circumstances was committed by this Defendant in that the State proved beyond a reasonable doubt and to a moral certainty that the Defendant committed Murder in the First Degree with the aggravating circumstance that the Defendant had been convicted of Murder in the Second Degree within twenty years of the time that he committed the Murder in the First Degree made the basis of this prosecution.
"The Court further finds in aggravation that the Defendant had been convicted of Murder in the Second Degree, a felony involving the use of violence to the person. The Court notes that this conviction for Murder in the Second Degree was the aggravating circumstance alleged in Count I of the Indictment for which Defendant was convicted.
"The Court further finds that this capital felony of Murder in the First Degree with aggravating circumstances was committed for pecuniary gain, in that the evidence showed that Defendant was without money on the night before the crime and that the Defendant when arrested had some Five Hundred ($500.00) Dollars on his person, some of which was in checks made payable to the victim, Lillian Montgomery. The evidence also showed that the victim's son, Jimmy Montgomery, on the day of the crime, checked the cash register till in victim's store and found it to be empty. The evidence further revealed that Defendant had the victim's diamond watch on his person at the time of his arrest; said watch being identified by victim's son as being hers and valued at some Four Hundred ($400.00) Dollars. This watch was evidently forcibly taken from the victim's body as the catch was broken on the watch when it was recovered by the police.
"The Court further finds this capital felony of Murder in the First Degree with aggravating circumstances was especially heinous, atrocious and cruel. The evidence revealed that the victim was shot three different times, with some period of time elapsing between the last two shots. The evidence disclosed a large pool of *596 blood surrounding the victim's head which was the result of a bullet wound to the mouth which shattered one of the victim's dentures. The victim then lay on the floor while her heart pumped the large pool of blood on the floor, then the third and final shot was fired which the testimony showed produced instantaneous death. The act and the means by which the Defendant accomplished it were indeed atrocious, heinous and cruel.
"This Court finds all of those aggravating circumstances to be present in this case and finds them sufficient to support the sentence of death imposed by the Jury.
"THEREFORE, after listening to the evidence presented and the arguments of the able attorneys, and after weighing the aggravating circumstances presented by the State and noting the absence of any mitigating circumstances which would justify the Court's refusal to accept the death penalty as fixed by the Jury, it is therefore the order and judgment of the Court that the Jury's verdict of death be accepted in the manner and form provided by law."
The defendant argues that the court erred in finding that the murder was committed for pecuniary gain and cites Ex Parte Cook, 369 So.2d 1251 (Ala.1978), rehearing denied, opinion corrected, February 9, 1979).
Cook was convicted of "robbery . . . when the victim is intentionally killed". Section 13-11-2(a)(2). The Supreme Court held that the aggravating circumstance of "a capital felony committed for pecuniary gain" was not to be applied to a robbery.
"At Cook's sentencing hearing the trial judge found that two aggravating circumstances were present: (4)a capital felony committed in the course of a robbery, and (6)a capital felony committed for pecuniary gain. In so finding we feel that the learned trial judge misconstrued the latter aggravating circumstance, in effect condemning Cook twice for the same culpable actstealing money. Subsection 6 would, of course, cover a variety of crimes committed with the hope of financial benefit, ranging from `murder-for-hire' to an heir killing his benefactor to gain his inheritance. But we do not think it appropriate to apply this aggravating circumstance to situations already condemned under subsection 4 which by definition involve an attempt at pecuniary gain. Thus, to avoid repetition, subsection 6 should not be applied to a robbery. The trial court erred in considering it and including it in the findings of fact."
Since the defendant in this case was not charged with robbery, subsection 6 could be an aggravating circumstance. Under the testimony presented at the sentencing hearing the court acted within its discretion in finding that it was an aggravating circumstance.

D.
Though not raised by the defendant, we note that the court's order does not contain a statement of "the findings of fact from the trial" as required by Section 13-11-4.
The court's order is also insufficient because it does not specify the mitigating circumstances enumerated in Section 13-11-7 which it found insufficient to outweigh the aggravating circumstances. If no mitigating circumstances exist, the order should so state. Consequently this cause must be remanded with instructions that the court's order be extended to include the findings of fact from the trial and the mitigating circumstances, if any, considered as required by statute.
We have carefully searched the record for any error prejudicial to the defendant. After due consideration to the record and to the alleged errors asserted on appeal it is our opinion that the defendant received a fair trial.
Remanded for further proceedings in accordance with this opinion.
All Judges concur.

*597 AFTER REMANDMENT
BOWEN, Judge.
On the return to our order of remand the trial judge has most adequately complied with Alabama Code Section 13-11-4 (1975) as directed. The findings of the trial court now being proper and in compliance with the statutory requirements, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
NOTES
[1] Omitting its formal parts the indictment is as follows:

"I. The Grand Jury of said County charge that before the finding of this Indictment J. B. Hubbard, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBARD, whose name is otherwise unknown to the Grand Jury, unlawfully and with malice aforethought, killed Lillian Montgomery, on to-wit: January 10, 1977, by shooting her with a pistol, and the Grand Jury further charge that at the time said killing was perpetrated, the said J. B. HUBBARD, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBAND had been convicted of murder in the second degree in the preceding twenty (20) years, on to-wit: October 10, 1957.
"II. The Grand Jury of said County further charge that before the finding of this Indictment J. B. HUBBARD, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBARD, whose name is otherwise unknown to the Grand Jury, unlawfully and with malice aforethought killed Lillian Montgomery, on to-wit: January 10, 1977, by shooting her with a pistol, but without premeditation or deliberation, and the Grand Jury further charge that at the time said killing was perpetrated, the said J. B. HUBBARD, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBARD had been convicted of murder in the second degree in the preceding twenty (20) years, on to-wit: October 10, 1957."
[2] The motion to dismiss also alleges that the defendant had filed another petition for writ of error coram nobis in the Circuit Court which was dismissed for "want of prosecution".
[3] Rule 50 reads in pertinent part:

"(T)he sentencing court shall not be required to entertain a second or successive petition [for writ of error coram nobis] for similar relief on behalf of the same prisoner. A successive petition on different grounds will not be entertained unless good cause is shown why the new ground or grounds were not known or could not have been reasonably ascertained when the first petition was heard."