[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 704 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 705 
The appellant, Jerry Devane Bryant, was convicted of murder made capital because it was committed during a kidnapping in the first degree. See § 13A-5-40(a)(1), *Page 706 
Ala. Code 1975. The jury, by a vote of 11-1, recommended that Bryant be sentenced to death. The trial court accepted the jury's recommendation and sentenced Bryant to death by electrocution.
The State's evidence tended to show the following. On January 27, 1997, Donald Hollis and his cousin Bert Brantley drove from Newville to an Auto Zone automobile parts store in Dothan, where Brantley purchased transmission fluid sealer to repair his car. Brantley testified that he and Hollis left Newville in Hollis's car at approximately 7:00 p.m. After leaving Auto Zone, at about 8:00 p.m., Hollis and Brantley were driving down Wheat Street in Dothan when they heard someone whistle at them. Brantley testified that Hollis turned his car around and then stopped, and that Bryant and another man, Ricky Vickers, approached the car. Soon after, Vickers left, and Hollis, Brantley, and Bryant had a conversation. According to Brantley, Bryant asked him and Hollis if they had been drinking, and Hollis said that they had not, but that he would go buy some beer. Bryant told Hollis to get the beer and to come back and pick him up in 30 minutes. After buying the beer, Hollis returned and picked up Bryant, and the three men drove around while Brantley and Bryant drank beer.
Brantley testified that they drove to his house in Newville, where the three of them went inside, drank beer, and talked. Brantley said that Bryant mentioned doing some drugs, but that Hollis and Brantley told Bryant that they did not do drugs. The three men then left Brantley's house and drove back to Dothan. After driving around Dothan for a while, Hollis drove Bryant back to the house where they had picked him up. Brantley testified that when they reached the house, Bryant did not get out of the car and that Bryant said he had something he wanted to talk to Hollis about. Hollis asked Bryant what it was, but Bryant did not say anything. Brantley further testified that he said he would turn his head and look out the window while Bryant talked to Hollis. Brantley said that he then heard a gasp, and when he turned back around, Bryant, who was in the backseat, was holding a gun to Hollis's head. According to Brantley, Bryant said, "This is what it's all about." (R. 458.) Bryant told Brantley to get out of the car. Brantley initially refused, but when Bryant became angry and said to him, "Nigger, get out of the car," Brantley got out of the car and stood beside the passenger's door for several minutes. (R. 459.) Hollis then rolled down his window and told Brantley that he would be back in a few minutes. Hollis and Bryant drove off.
Brantley testified that he waited around 10 minutes for Hollis to return, but that he got scared and walked to a service station down the road. Brantley used the telephone at the service station to call his sister to come and pick him up. Brantley also tried to reach Hollis by calling him on Hollis's cellular telephone. Brantley testified that Bryant answered the telephone and told Brantley that Hollis was with Bryant's brother. Bryant wanted to know where Brantley was so that he could come and get him. Brantley called Hollis's cellular telephone several more times; each time he got Bryant. Brantley told Bryant that he was going to telephone the police, and Bryant said that he did not want any trouble. Brantley's sister then arrived to pick Brantley up, and they telephoned the police.
Ricky Vickers testified that on the evening of January 27, 1997, he saw Bryant leave with Hollis in Hollis's car. Vickers testified that later that same night Bryant returned to his house in Hollis's car, but that Bryant was alone. Vickers later went riding with Bryant in the car, and Bryant *Page 707 
told Vickers that Hollis was with a friend of Bryant's. Bryant and Vickers went to "Mickey's," a nightclub. When Bryant and Vickers left the club, the police were standing around Hollis's car. Vickers walked off, and Bryant picked him up several blocks away from the club in Hollis's car. Vickers testified that Bryant had said he wanted him to help him do something. Vickers stated that Bryant told him that Bryant had done something, and that he "had to kill the victim." (R. 524.) Vickers testified that Bryant had a gun and told him that if he did not help him, he was "going to do Vickers." (R. 526.) The two men then went back to Vickers's house, where they each got a pair of gloves. Bryant then drove to where Hollis's body was located. Vickers testified that after Bryant put some clothes and towels in the trunk of Hollis's car, they put Hollis's body in the trunk.
Vickers testified that he and Bryant drove to Greenwood, Florida, to the home of Raymond Mathis. Mathis rode around with Bryant and Vickers in Hollis's car, and Bryant and Mathis discussed selling Hollis's cellular telephone. According to Vickers, Mathis said that he knew someone who would give them crack in exchange for the cellular telephone. After Bryant traded Hollis's cellular telephone for crack, the men returned to Mathis's house, and Bryant told Mathis that there was a body in the trunk. Bryant wanted to know where he could dump the body. Bryant, Vickers, and Mathis left Mathis's house, drove down a dirt road, and dumped Hollis's body. Bryant and Vickers then drove to Tallahassee, Florida, where they tried unsuccessfully to sell Hollis's car. Bryant and Vickers returned to Dothan, and abandoned Hollis's car, after cleaning the inside and wiping away any fingerprints. Vickers testified that they then looked for the "other guy" (Brantley) because Bryant believed that Brantley could identify him. According to Vickers, Bryant planned to kill Brantley. Raymond Mathis testified to essentially the same facts as did Vickers.
Lori Ann Andrews, Bryant's girlfriend, testified that on January 29, 1997, Bryant and Vickers arrived at her apartment in a black car that she had never seen before. Bryant asked her if she would pick him up at his mother's house in a few minutes. Bryant and Vickers left, and Andrews picked Bryant up as he had requested, and they went back to her apartment. Andrews further testified that the police came to her apartment to arrest Bryant that evening, and that when they knocked on the door, Bryant tried to give her a set of keys. The keys were later identified at trial as belonging to Hollis.
Testimony at trial further revealed that a bloodstain on Bryant's blue jeans was consistent with a mixture of Bryant's blood and Hollis's blood. Bloodstains found inside the trunk of Hollis's car and on the bumper and taillight of the car were consistent with Hollis's blood.
In his statement to police, Bryant initially denied any involvement in Hollis's murder. However, he eventually admitted to being with Hollis in Hollis's car, but he claimed that Hollis left with a "guy named Terry Johnson" and that he let Bryant use his car. Bryant said that he saw Johnson later that night and that Johnson had asked him to move Hollis's body. Bryant stated that he agreed to do it for a substantial amount of cocaine, and he got Vickers to help him dump the body in Florida. Bryant denied shooting Hollis, but said that he was with Johnson when Johnson shot Hollis. When giving his statement, Bryant was asked why it took so many shots (three shots to the head) to kill the victim. According to testimony from the police officer taking the statement, Bryant said "Man, I don't know, I think I need help. Sometimes I am just *Page 708 
not Jerry." (R. 788.) According to the officer, Bryant then put his head down, covered his ears, and refused to talk anymore.
On appeal from his convictions, Bryant raises nine issues, some of which he did not raise by objection in the trial court. Because Bryant was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against Bryant as to any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343
(Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993);Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886,112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
This court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."`" Burton v. State,651 So.2d 641, 645 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659
(Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973,131 L.Ed.2d 862 (1995), quoting United States v. Young,470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163,102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). Accordingly, we will address the issues raised by Bryant on appeal.
 I.
Bryant contends that the trial court erred in granting the State's challenge for cause as to prospective juror R.C. The record reveals that during the general voir dire examination of the jury venire, the prosecutor asked the venire-members whether, because this was a capital-murder case and the State would be asking them to recommend the death penalty if Bryant was convicted, they would have to be absolutely certain before they could return a guilty verdict. Prospective juror R.C. answered that he would. Later, during individual questioning of R.C., the following occurred:
 "The Court: [R.C.], you had responded to a question by the State about on the burden of proof. And it was something to the effect of I believe that would you have — anyway, whether you would abide by the beyond a reasonable doubt standards, or would it be to an absolute certainty I think.
 "Would you be able to — in a death penalty case, would you be able to apply the reasonable doubt standard? Or do you think — and that is that you are convinced beyond a reasonable doubt, that is a doubt for which you can give a reason based on the evidence.
 "[R.C.]: In a death penalty case?
 "The Court: Uh-huh.
 "[R.C.]: I'd really like to have solid proof.
 "The Court: What do you call solid? Of course, you couldn't have been there and seen what happened or you wouldn't even be on the jury. Are you talking about eyewitness testimony or —
 "[R.C.]: Yeah. You know, at least good eyewitness testimony.
 "The Court: But, anyway, without eye-witness testimony, you say you could not render a verdict in a death penalty against a defendant? *Page 709 
 "[R.C.]: It would be hard in a death penalty case for me.
 "The Court: Any questions, Mr. Maxwell [the prosecutor]?
 "[The prosecutor]: No, sir.
 "The Court: Or for the defense?
 "[Defense counsel]: I would like to ask a couple. Tell me your name again.
 "[R.C.]: [R.C.]
 "[Defense counsel]: [R.C.] You consider yourself a law-abiding citizen?
 "[R.C.]: Uh-huh.
 "[Defense counsel]: And you'd follow the laws of the Court and you would attempt to follow the judge's instructions?
 "[R.C.]: Right.
 "[Defense counsel]: Is that correct?
 "[R.C.]: Uh-huh.
 "[Defense counsel]: And if the Court instructed you after you heard all the evidence that — and assume it is all circumstantial evidence, there were no eye-witnesses. But, after you have heard all of the evidence, you don't have — you can't come up with another reasonable explanation for what happened, and the only thing that makes sense is that the Defendant did this and there is not another reasonable explanation to explain the evidence, would you be able to vote guilty on this case?
 "[R.C.]: I don't believe so, not in a death penalty.
 "[Defense counsel]: Well, and the death penalty is a separate issue. Would you be able to vote guilty or not guilty based on that?
 "[R.C.]: I probably could.
 "[Defense counsel]: You could probably vote guilty just talking about the guilt or innocence phase of it?
 "[R.C.]: Right.
 "[Defense counsel]: If you looked at the evidence and you couldn't find a reasonable explanation for anything except he did it, you could vote guilty on that?
 "[R.C.]: Probably could, yeah.
 "[Defense counsel]: And then the next question is — and because that's the first. This is a two-part trial. The second part of this would be after — and this would be after the whole jury has looked at the evidence and says we can find no other reasonable explanation. And we don't know this will happen, but assuming it did. We can find no other reasonable explanation, the Defendant is guilty in this case, then you get into looking at aggravating and mitigating circumstances.
 "And the Court would instruct you that the list of aggravating circumstances that [the prosecutor] would present to you and you would weigh that against the mitigating circumstances, which is evidence we would present which might suggest reasons not to impose the death penalty, that life without parole would be more appropriate. But, if you find that there were not enough mitigating circumstances and the aggravating was just outweighing them, could you vote for the death penalty if the Court instructed you that was the law?
 "[R.C.]: Yes.
 "[Defense counsel]: Thank you, Judge.
 "The Court: Okay. Thank you.
 "[The prosecutor]: Can I ask a question?
 "The Court: Yes.
 "[The prosecutor]: At the sentencing phase of the case, assuming there is no eyewitness, could you vote death?
 "[R.C.]: It would be tough for me on circumstantial evidence on a death penalty case.
 "[The prosecutor]: Thank you.
 "The Court: I guess what he's saying is, even though you found him guilty at the *Page 710 
guilt stage, if you had to do that just based on circumstantial evidence, could you go on to recommend the death penalty in a no eyewitness case if the aggravating circumstances presented were heavy?
 "[R.C.]: Yeah, I believe I could.
 "The Court: In a no eyewitness case?
 "[R.C.]: (Nodding head in affirmative.)
 "The Court: That's all then. Thank you."
(R. 320-25.)
In Drinkard v. State, 111 So.2d 225 (Ala.Cr.App. 1998), in reviewing and upholding the trial court's granting of the prosecution's challenges for cause as to two prospective jurors based on their opposition to the death penalty, we said:
 "`"`The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.'" Wainwright v. Witt, 469 U.S. 412, [424], 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi 481 U.S. 648, [658], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath notwithstanding his views on capital punishment." Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proven with "unmistakable clarity" because "juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." Id.
 "` "`A trial judge's finding on whether or not a particular juror is biased "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." Witt, 469 U.S. at 429, 105 S.Ct. at 855. That finding must be accorded proper deference on appeal. Id. "A trial court's ruling on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion." Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204
(Ala. 1981).'"
 "'McWilliams v. State, 640 So.2d 982, 999
(Ala.Cr.App. 1991), affirmed in part, remanded on other grounds, 640 So.2d 1015 (Ala. 1993), quoting Martin v. State, 548 So.2d 488, 490-91
(Ala.Cr.App. 1988), affirmed, 548 So.2d 496 (Ala. 1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
 "`"In determining whether a veniremember's views might prevent or `substantially impair the performance of his duties as a juror,' . . . a trial court is aided by being able to observe the potential juror's demeanor and tone in responding. There is no special phrase that will resolve the indecisiveness of a potential juror's responses." Rogers v. State, 638 So.2d 1347 (Ala.Cr.App. 1992), citing Watkins v. State, 509 So.2d 1071, 1073
(Ala.Cr.App.[1986]), affirmed, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).
 "`"`Many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be *Page 711 
unable to faithfully and impartially apply the law. This is why deference must be paid to the trial judge who sees and hears the juror.'"
 "'Coral v. State, 628 So.2d 954, 970
(Ala.Cr.App. 1992), after remand, 628 So.2d 988
(Ala.Cr.App. 1992), affirmed, 628 So.2d 1004
(Ala. 1993)[,] quoting Wainwright v. Witt, 469 U.S. at 424-26, 105 S.Ct. at 852-53 (footnote omitted).'
 "Jackson v. State, 674 So.2d 1318, 1340-42
(Ala.Cr.App. 1993), aff'd in part, rev'd in part, 674 So.2d 1365 (Ala. 1994). See also Taylor v. State, 666 So.2d 36 (Ala.Cr.App. 1994), opinion extended after remand, 666 So.2d 71 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
 "As noted above, `despite [the] lack of clarity in the printed record . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.' Jackson, 674 So.2d at 1342, quoting Coral, 628 So.2d at 970. After reviewing the record of the voir dire examination of each of the two prospective jurors, we are convinced that this is such a situation. Although the prospective jurors' responses wavered depending upon how the questions were posed and by whom, the overall impression from the record is that because of their opposition to the death penalty, the two prospective jurors would not recommend imposition of the death penalty, even if the evidence warranted it. Furthermore, in addition to being able to listen to the prospective jurors' responses to various questions, the trial court also had the opportunity to observe the prospective jurors' demeanor, body language, and tone of voice. Accordingly, we find no abuse of discretion in the trial court's removal for cause of the two prospective jurors."
777 So.2d at 266-67.
Here, after reviewing the voir dire examination of prospective juror R.C., we cannot conclude that the trial court abused its discretion in granting the State's challenge for cause. The record shows that although R.C., in answering one of the trial court's questions, indicated that he could vote guilty and impose the death penalty in a circumstantial-evidence case, his answers to other questions posed by the attorneys and by the trial court indicated that he would be unable to find a defendant guilty and to recommend the death penalty in a case based solely on circumstantial evidence. In light of R.C.'s vacillating answers, and in deference to the trial judge, who, in addition to hearing the words spoken by R.C., had the opportunity to observe R.C.'s demeanor and appearance, his manner of speech and tone of voice, and his body language during his responses, we do not find that the trial court abused its discretion. As we stated earlier, a juror's bias need not be proved with "unmistakable clarity" because "juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism." See Drinkard, supra.
In Thomas v. State, 539 So.2d 375 (Ala.Cr.App. 1988), we said the following, relevant to Bryant's claim concerning prospective juror R.C.:
 "In Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), the U.S. Supreme Court addressed the question of whether to apply the statutory presumption of correctness [28 U.S.C. § 2254(d)] to a state trial court's decision concerning a denial of the defendant's challenge for cause. In deciding that the statutory presumption of correctness should be applied to a trial *Page 712 
court's resolution concerning challenges for cause, the Supreme Court gave two reasons.
 "`First, the determination has been made only after an often extended voir dire proceeding designed specifically to identify biased veniremen. It is fair to assume that the method we have relied on since the beginning, e.g., United States v. Burr, 25 F.Cas. No. 14,692g, pp. 49, 51 (No. 14,692g) (CC Va. 1807) (Marshall, C.J.), usually identifies bias. Second, the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to "special deference." E.g., Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 500, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984).'"
"Patton, 104 S.Ct. at 2892 (footnote omitted).
"The reasons set out above are also the reasons this court gives great weight to a trial court's decision on challenges for cause.
"In addressing whether there was fair support in the record for the trial court's denial of the challenges for cause inPatton, the Supreme Court stated:
 "`The testimony of each of the three challenged jurors is ambiguous and at times contradictory. This is not un-usual on voir dire examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.'"
"Patton, 104 S.Ct. at 2893.
"The U.S. Supreme Court's discussion, concerning two of the challenges for cause in Patton, is particularly relevant to the challenge for cause as to juror Lovell.
 "`Similarly, in the case of alternate juror Pyott, we cannot fault the trial judge for crediting her earlier testimony, in which she said that she could put her opinion aside "[i]f [she] had to," rather than the later testimony in which defense counsel persuaded her that logically she would need evidence to discard any opinion she might have. Id., at 246a, 250a-252a. Alternate juror Chincharick's testimony is the most ambiguous, as he appears simply to have answered "yes" to almost any question put to him. It is here that the federal court's deference must operate, for while the cold record arouses some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty.'
 "Patton, 104 S.Ct. at 2893."
539 So.2d at 388-89 (footnote omitted).
For the reasons set out above, we do not find that the trial court abused its discretion in granting the State's challenge for cause as to prospective juror R.C. R.C.'s answers were at times contradictory; thus, *Page 713 
the trial judge was in the best position to determine which of R.C.'s answers were "said with the greatest comprehension and certainty." Id. Accordingly, we find no error as to this claim.
 II.
Bryant contends that the State presented inadmissible hearsay testimony that, before making a statement to police, Bryant was advised of his constitutional rights under Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The record reveals that on January 29, 1997, Bryant was interviewed by Sergeant Jim Stanley of the Dothan Police Department. Also present during Bryant's interview was Sergeant David Jay of the Dothan Police Department. Stanley was permitted to testify, over Bryant's objection, that Jay advised Bryant of his Miranda rights before any questioning. Stanley testified that he was present and that he heard Jay read Bryant the warnings. Stanley then recited the rights and the waiver of rights he heard Jay read to Bryant.
"`Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' Edward W. Cleary, McCormick onEvidence 584 (1972)." James v. State,723 So.2d 776, 779 (Ala.Cr.App.), cert. denied, 723 So.2d 786 (Ala. 1998). "If a statement previously made out of court is offered in evidence through a witness or a writing, not for the purpose of establishing the truth of the matter stated, but merely for the purpose of establishing the fact that the statement was made, the evidence is admissible, if it is relevant, and it is not subject to the exclusionary impact of the hearsay rule." 2 Jones onEvidence (6th Ed.) § 8:6. See also J. Colquitt,Alabama Law of Evidence, § 8.2. Further, "[a]n extrajudicial statement is inadmissible as hearsay only when offered as evidence of the truth of the matter to which it relates. If the statement is offered merely to show the fact of its having been made, it is admissible through the person who hears it." 2 Wharton's Criminal Evidence (14th Ed.) § 266.
The statement by Sgt. Stanley was not hearsay — it was not offered to prove the truth of the matter asserted therein. The State was not attempting to prove the truth of theMiranda warnings, but instead offered Stanley's testimony to prove that the Miranda warnings were indeed read and explained to Bryant before he made a statement. The relevance of Sgt. Stanley's statement was only in that it was made, and such statements are not considered inadmissible hearsay. Stanley heard the warnings read to Bryant, and he properly testified to that fact. We conclude that Stanley's testimony was not hearsay, and that proof that Miranda warnings were given may be made by anyone who was present and heard them.
 III.
Bryant contends that during the penalty phase of the trial, the trial court created a presumption in favor of a death sentence by instructing the jury that it had to determine whether the mitigating circumstances outweighed the aggravating circumstances. This instruction, he says, violated § 13A-5-46, Ala. Code 1975, which requires that in order to recommend the death penalty, the jury must find that the aggravating circumstances outweigh the mitigating circumstances. Bryant argues that the trial court's instruction was "death oriented." (Bryant's brief to this court, p. 21.) Bryant did not object to the trial court's instructions on this ground; therefore, *Page 714 
our review will be for plain error. Rule 45A, Ala.R.App.P.
Contrary to Bryant's contention, we do not believe that the complained-of portion of the trial court's charge created a presumption in favor of a death sentence by leading the jury to believe that it had to find that the mitigating circumstances out-weighed the aggravating circumstances before it could recommend a sentence of life imprisonment without parole. SeeEx parte Cothren, 705 So.2d 861, 870-71 (Ala. 1997), cert. denied, 523 U.S. 1029, 118 S.Ct. 1319, 140 L.Ed.2d 482
(1998) (finding no error in similar instruction). Furthermore, later in the jury charge, the trial court properly instructed the jury that before it could recommend the death penalty, it had to find that the aggravating circumstances outweigh the mitigating circumstances. The trial court's instructions, taken as whole, did not create a presumption in favor of a verdict recommending the death penalty. See Cothren, supra; see alsoArthur v. State, 711 So.2d 1031 (Ala.Cr.App. 1996); Exparte Trawick, 698 So.2d 162 (Ala.), cert. denied,522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997); Brown v.State, 686 So.2d 385, 401 (Ala.Cr.App. 1995).
 IV.
Bryant further contends that the prosecutor engaged in two acts of misconduct at his trial. Initially we note that Bryant objected to only one of the prosecutor's alleged acts of misconduct. "`This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v.State, 577 So.2d 474, 489 (Ala.Cr.App. 1990), aff'd,577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242,116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright,778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872,108 S.Ct. 201, 98 L.Ed.2d 152 (1987). Thus, we will accordingly address Bryant's claims of alleged prosecutorial misconduct. See Rule 45A, Ala.R.App.P.
This court has stated that "[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." Bankhead v.State, 585 So.2d 97, 106 (Ala.Cr.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala. 1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App. 1992), rev'd on other grounds,625 So.2d 1146 (Ala. 1993). See also Henderson v. State,583 So.2d 276, 304 (Ala.Cr.App. 1990), aff'd, 583 So.2d 305
(Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268,117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.2d at 107, quotingDarden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464,2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v.DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431
(1974)). "A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." Roberts v. State,735 So.2d 1244, 1253-54 (Ala.Cr.App. 1997), aff'd,735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346,145 L.Ed.2d 271 (1999). Moreover, "statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." Bankhead *Page 715 585 So.2d at 106. "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v.State, 357 So.2d 397, 399 (Ala.Cr.App. 1978), and that court is given broad discretion in determining what is permissible argument." Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.
Bryant contends that the following comment made by the prosecutor during his questioning of prospective jurors concerning their views on capital punishment was improper:
 "Okay. The judge talked a bit about the death penalty. And I can assure you that, during the course of this case, that we are going to ask that you find the Defendant guilty of capital murder. And then we are going to have a sentencing phase of the case if that occurs and you do that. And we will ask you to find that what is called aggravating circumstances outweigh the mitigating circumstances of this case. And based on that, we would ask you to recommend to the judge that the Defendant be sentenced to death.
 "Now, I know the judge has asked you is anybody against the death penalty, basically is what his question is. You've had time to think about that.
 "I have been involved in several capital murder cases. And I have seen where initially a juror or jurors might feel that they could recommend the death penalty. But, when they get in this box here and it gets time to actually do that, it gets tough. And I can understand that. And I can sympathize with that.
 "I don't know what their defense strategy is going to be, but I have seen in the past where they try to put a guilt trip on the jury about you are going to have to live with this the rest of your life if you make that decision.
 "If any of you have a problem or think that you might have a problem recommending the death penalty, if we, the State of Alabama, prove to you beyond a reasonable doubt that the aggravating circumstances — I am just going by what the law is and the judge will explain that to you later — the aggravating circumstances outweigh the mitigating circumstances, then it would be your duty to recommend the death penalty.
 "Now, does anybody feel like they might have a problem doing that?"
(R. 179-81.) (Emphasis added to indicate that portion of argument complained of on appeal.) Bryant did not object to the prosecutor's comment.
We do not agree with Bryant's argument on appeal that the prosecutor's comment was "intended to inflame the jury against the defense by offering pure speculation about what the defense might do in the course of the trial." (Bryant's brief to this court, p. 21.) We instead find that the prosecutor, in order to discern the jurors' views on the death penalty, properly questioned prospective jurors as to whether, if actually faced with such a decision, they could recommend the death penalty. Often at sentencing in a capital-murder trial, defense counsel, in an attempt to obtain a sentencing recommendation of life imprisonment without parole, will appeal to the jurors' emotions by stressing to them that they will have to live the rest of their lives with their sentencing recommendation. It is therefore understandable that the State would seek to ensure that it removes those jurors who might be unable to recommend a death sentence because of such factors as feelings of guilt, religious convictions, or moral philosophy."Witherspoon v.Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776
(1968), allows the prosecution *Page 716 
in a capital case to strike for cause those potential jurors who would automatically vote against imposing capital punishment without regard to any evidence that might be developed at trial or those potential jurors whose attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Ex parte Smith, 698 So.2d 219, 221
(Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385,139 L.Ed.2d 300 (1997). Accordingly, we find no plain error as to the prosecutor's comment during voir dire.
Bryant also contends that during the penalty-phase closing arguments, the prosecutor improperly "reduced the role of the jury to a trivial function and mocked the critical role that juries play in sentencing in Alabama's capital scheme," by making a comment that, he says, minimized the jury's responsibility in determining sentence, in violation ofCaldwell v. Mississippi 472 U.S. 320, 105 S.Ct. 2633,86 L.Ed.2d 231 (1985).
The record reveals that during defense counsel's closing argument at the penalty phase, the following occurred:
 "Now, as you know from the first stage, I am speaking now. [The prosecutor] is going to get back up and talk to you. And you know, he, the State, the prosecution should go last because they have the burden of proof. Even in this stage, they have the burden of proof. So they should go last.
 "But, at the same time, I don't know exactly what he's going to say, so I don't know what else to argue to you. I do know — from past trials and being in this situation, I know the arguments that have been presented after I have sat down.
 "And I know that sometimes I have been confronted with the argument that the prosecutor may say don't you worry about your decision, that — I have heard it put this eloquently, that `I am the soldier of death, not you,' and that the prosecution will take the responsibility for this. After hearing that once, I am going to respond in case I hear it again, that that's not correct. That's not correct.
 "As you know, the prosecution is up here seeking the death penalty. I am in front of you seeking life in prison without the possibility of parole. That is his job and his responsibility. And I have told you my job and my responsibility.
 "The decision — that decision is yours, every one of yours. I can't take responsibility for your decision. The prosecution can't take responsibility for your decision. And in this case, if [the prosecutor] wasn't going to argue that, then I apologize. But, like I said, I have just got to go on what I have heard in the past.
 "I have also heard from time to time quotes from the Bible. And, you know, I never know if that's what I am going to hear or not. And I don't know if [the prosecutor] was going to say one or will say one.
 "But I would point out that usually when I hear quotes from the Bible, I hear quotes at this stage that come from the Old Testament. Things as simple as an eye for an eye, a tooth for a tooth or things such as Numbers 36:16 — let me make sure, 35:16, paraphrasing if you kill someone with an instrument of iron, you are a murderer and you shall be put to death, these things.
 "What I am getting at, though, is these quotes usually come out of the Old Testament. And what I always look at is something in response from the New Testament, something from after Christ was here. Romans 8:2 is what I look at, because it just says, once again paraphrasing, something like `For the spirit *Page 717 
of life in Christ Jesus has set me free from the spirit of sin and death.'
 "And the reason I am bringing these things up is this is what I have heard in the past after I have sat down and I have never been able to respond, so I decided today I was — if any of these are accurate, I was going to respond.
 ". . . .
 "At this stage, it's not [the prosecutor's] decision, it's not my decision. At this stage, I can truly say I am glad I am over here because it's your decision."
(R. 1085-88.) The State, in response to defense counsel's closing argument, made the following comments during its rebuttal closing argument to the jury at the penalty phase:
 "Remember Monday [during voir dire] when we had the group out here and I was talking to you about whether or not when we come to this stage of the trial, that you would have the ability to recommend death if the aggravating circumstances outweighed the mitigating.
 "Remember I tried to seek out anybody who felt like, well, when it comes right down to it, I just don't think I can do it. And I also told you, I said because what's going to happen is a lot of times the defense tries to lay a guilt trip on you. And that's what they are doing.
 "Don't be fooled for one minute. It's not your decision that decides whether or not he gets life without parole or the death penalty. It's that man seated right up there."
(R. 1089.) (Emphasis added to that portion of argument complained of on appeal.) Defense counsel objected to the prosecutor's comment, arguing that it was inappropriate and was contrary to Alabama law. The trial court stated that it would "not really sustain the objection, but let's stay away from that type of argument." (R. 1090.) Although we do not approve of the prosecutor's comment, we do not find that it requires a reversal.
As we stated in Taylor v. State, 666 So.2d 36
(Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied,516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996), in addressing whether comments by the prosecutor in that case, similar to the prosecutor's comment in this case, were improper:
 "We condemn the prosecutor's comment during his opening remarks at the penalty phase that the jury should not "personally feel like that [they are] making a decision on someone's life" because that particular comment tends to encourage irresponsibility on the part of the jury in reaching its sentencing recommendation. However, the condemnation in Caldwell v. Mississippi 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), is that `it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' 472 U.S. at 328-29, 105 S.Ct. at 2639. We fully support that principle, yet under Alabama law, the trial judge — not the jury — is the `sentencer.' `We reaffirm the principle that, in Alabama, the "judge, and not the jury, is the final sentencing authority in criminal proceedings." Ex parte Hays, 518 So.2d 768, 774
(Ala. 1986); Beck v. State, 396 So.2d [645] at 659 [Ala. 1980]; Jacobs v. State, 361 So.2d 640, 644 (Ala. 1978), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979).' Ex parte Giles, 632 So.2d 577, 583 (Ala. 1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825
(1994). `The jury's verdict whether to sentence a defendant to death or to life without parole is advisory only.' Bush v. State, 431 So.2d 555, 559 (Ala.Crim.App. 1982), aff'd, 431 So.2d 563
(Ala. 1983), cert. denied, *Page 718 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). See also Sockwell v. State, 675 So.2d 4
(Ala.Cr.App. 1993). `We have previously held that the trial court does not diminish the jury's role or commit error when it states during the jury charge in the penalty phase of a death case that the jury's verdict is a recommendation or an "advisory verdict." White v. State, 587 So.2d 1218
(Ala.Cr.App. 1990), aff'd, 587 So.2d 1236 (Ala. 1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142
(1992).' Burton v. State, 651 So.2d 641
(Ala.Cr.App. 1993).
 "Considering the prosecutor's statements in the context of the entire trial, in the context in which those statements were made, and in connection with the other statements of the prosecutor and of the trial court, which correctly informed the jury of the advisory function of its verdict, we find no reversible error in the record in this regard.
 "`In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses "(o)ur ask is to consider their impact in the context of this particular trial", and "not view the group of allegedly improper questions and comments in the abstract." United States v. Davis, 546 F.2d 583, 593 (5th Cir.1977). "(W)e must assess the impact of the questions in the context of the entire trial." United States v. Bosby, 675 F.2d 1174, 1185
(11th Cir.1982).'"
 "Wysinger v. State, 448 So.2d 435, 438
(Ala.Cr.App. 1983). We find no reasonable possibility that the jury was misled, misinformed, or confused as to its critical role in sentencing under Alabama law. See Martin, 548 So.2d at 494."
666 So.2d at 50-51 (footnote omitted).
Our review of the prosecutor's comment, in the context of the entire closing arguments, and in connection with the trial court's comments and instructions to the jury on its role at sentencing, leads us to conclude that the prosecutor was not attempting to minimize or to diminish the jury's sense of responsibility during sentencing. Instead, the comment was a response to defense counsel's argument that the sentence Bryant received was the jury's decision and its decision alone. " `[W]ide latitude is given the State's prosecutors when a response is made during closing argument to an argument previously made by opposing counsel'" Dill v. State,600 So.2d 343, 355 (Ala.Cr.App. 1991), aff'd, 600 So.2d 372
(Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293,122 L.Ed.2d 684 (1993), quoting Mitchell v. State,480 So.2d 1254, 1257 (Ala.Cr.App. 1985).
 "In order to determine whether a prosecutor's statement is improper, it must be examined in its context and in light of what transpired, `that is, in light of the preceding argument of defense counsel to which the prosecutor's argument was an answer.' Henderson v. State, 460 So.2d 331, 333
(Ala.Cr.App. 1984) (citations omitted). See also Touart [v. State, 562 So.2d 625
(Ala.Cr.App. 1989)]. `Remarks or comments of the prosecuting attorney, including those which might otherwise be improper, are not grounds for reversal when they are invited, provoked, or occasioned by accused's counsel and are in reply to or retaliation for his acts and statements.' Id."
Dill, 600 So.2d at 356. See also Davis v.State, 494 So.2d 851 (Ala.Cr.App. 1986). "`As we explained in United States v. Young, 470 U.S. 1 [105 S.Ct. 1038,84 L.Ed.2d 1] (1985), the idea of "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole." McNair v. State, 653 So.2d 320, 339
(Ala.Cr.App. 1992), aff'd, 653 So.2d 353 (Ala. 1994), cert. denied, *Page 719 
513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995), quotingDarden v. Wainwright, All U.S. at 182, 106 S.Ct. at 2472.
 "`[I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." The relevant question is whether the prosecutors' comments "so infected the trial with un-fairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).'"
Burton v. State, 651 So.2d 641, 651 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115,115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). (Citation omitted.) We do not find that the prosecutor's comment in this case, taken in context, "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Burton,651 So.2d at 651.
Further, the trial court accurately instructed the jury as to its role at sentencing, and specifically instructed the jury that its sentencing recommendation was "very important." (R. 1094.) The trial court also instructed the jury that, in the event it could not reach a sentencing recommendation, it should not "act hastily or assume that [it] cannot reach a verdict or that [it] should disregard the seriousness of these proceedings." (R. 1107.) The trial court went on to say:
 "But carefully listen to and consider the views of the other jurors before you vote. Carefully weigh, sift and consider all of the evidence. Keep in mind that a human life is at stake and use your best judgment on the only issue for you, that is whether or not you should recommend life without parole or death in this case."
(R. 1107.)
Considering the prosecutor's isolated comment, which was made in response to a closing argument by defense counsel that arguably could have misled the jury to believe that it bore the sole responsibility at sentencing, we conclude that, in the context of the entire trial and in connection with the instructions of the trial court correctly informing the jury of its role at sentencing, there was no reasonable possibility that the jury was "misled, misinformed, or confused as to its critical role in sentencing under Alabama law." Taylor v. State,666 So.2d 36 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert, denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
 V.
Bryant also contends that he was denied his right to court-appointed counsel because one of his court-appointed attorneys, Derek Yarbrough, did not have five years of prior experience in the active practice of criminal law. This claim was not presented to the trial court until the hearing on Bryant's motion for a new trial; therefore, our review will be for plain error. Rule 45A, Ala.R.App.P.
Section 13A-5-54, Ala. Code 1975, provides that a person indicted for a capital offense who is not able to afford an attorney must be provided with court-appointed counsel having no less than five years' prior experience in the active practice of criminal law. The record reflects that the trial court initially appointed Yarbrough and Tom Motley, a lawyer with more than five years' prior experience in the active practice of criminal law, to represent Bryant at trial. Motley was allowed to withdraw from the case, and the trial court appointed Deborah Seagle to represent Bryant along with Yarbrough. According to Yarbrough's testimony at the hearing on the motion for a new trial, he and Seagle requested that additional counsel be appointed to assist them in representing Bryant because neither Yarbrough nor Seagle had previously tried a capital murder *Page 720 
case. The trial court then appointed Gene Spencer, who had been involved with two other capital murder cases at both the trial level and the appellate level, to assist Yarbrough and Seagle in representing Bryant at trial. Both Seagle and Spencer had five years of prior experience in the active practice of criminal law. Yarbrough, at the time of the trial, had approximately two years' experience in the active practice of criminal law and, before passing the bar exam, had worked for three years at a criminal law firm assisting in the preparation and investigation of criminal cases. The above notwithstanding, Bryant argues that because Yarbrough "effectively directed" Bryant's defense at trial and served a "leading role in the case," he was denied his right to appointed counsel under §13A-5-54. Bryant urges this court to read § 13A-5-54 "to require that the lawyer with the leading role in the case meet the five-year requirement." (Bryant's brief to this court, p. 26.) We decline to do so.
Under § 13A-5-54, Bryant was entitled to only one attorney with five years' experience in the active practice of criminal law. See Parker v. State, 587 So.2d 1072
(Ala.Cr.App. 1991), aff'd, 610 So.2d 1181 (Ala. 1992), cert. denied,509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). See alsoHyde v. State, 778 So.2d 199 (Ala.Cr.App. 1998). Bryant instead was appointed three attorneys, two of whom had the requisite five years' experience in the active practice of criminal law, and one of whom had approximately two years of experience. The simple fact that Yarbrough assumed a "leading role" in the case does not demonstrate that Bryant was denied his right to appointed counsel provided for in § 13A-5-54; that section provides only for the appointment of one attorney with five years' experience in the active practice of criminal law. Accordingly, we find that Bryant had the counsel to which he was entitled under § 13A-5-54, Ala. Code 1975.
 VI.
Bryant also contends that the trial court erroneously instructed the jury at the penalty phase on the aggravating circumstance that the capital offense was committed for pecuniary gain. See § 13A-5-49(6), Ala. Code 1975. He likewise contends that the trial court erred in finding that that aggravating circumstance existed in this case. Bryant argues that the pecuniary-gain aggravating circumstance is applicable only to the capital offense of "murder for hire." See § 13A-5-40(a)(7), Ala. Code 1975. We find no merit to Bryant's claim.
In Hubbard v. State, 382 So.2d 577 (Ala.Cr.App. 1979), aff'd, 382 So.2d 597 (Ala. 1980), set aside on other grounds, 405 So.2d 695 (Ala. 1981), the defendant was convicted of murder made capital because he had been convicted of another murder in the 20 years preceding the charged offense. On appeal, the defendant raised a claim like the one raised here by Bryant. We stated:
 "The defendant argues that the court erred in finding that the murder was committed for pecuniary gain and cites Ex parte Cook, 369 So.2d 1251 (Ala. 1978), rehearing denied, opinion corrected, February 9, 1979.
 "Cook was convicted of `robbery . . . when the victim is intentionally killed.'. Section 13-11-2(a)(2). The Supreme Court held that the aggravating circumstance of `a capital felony committed for pecuniary gain' was not to be applied to a robbery.
 "`At Cook's sentencing hearing the trial judge found that two aggravating circumstances were present: (4) — a capital felony committed in the course of a robbery, and (6) — a capital felony committed for pecuniary gain. In so finding we feel that the learned trial judge misconstrued the *Page 721 
latter aggravating circumstance, in effect condemning Cook twice for the same culpable act [—] stealing money. Subsection 6 would, of course, cover a variety of crimes committed with the hope of financial benefit, ranging from "murder-for-hire" to an heir killing his benefactor to gain his inheritance. But we do not think it appropriate to apply this aggravating circumstance to situations already condemned under subsection 4 which by definition involve an attempt at pecuniary gain. Thus, to avoid repetition, subsection 6 should not be applied to a robbery. The trial court erred in considering it and including it in the findings of fact.'"
 "Since the defendant in this case was not charged with robbery, subsection 6 could be an aggravating circumstance. Under the testimony presented at the sentencing hearing the court acted within its discretion in finding that it was an aggravating circumstance."
382 So.2d at 596.[1]
As was the case in Hubbard, Bryant was not charged with robbery; therefore, the aggravating circumstance that the murder was committed for pecuniary gain could be properly considered and found to exist in this case. The State's evidence tended to show that Bryant traded the victim's cellular telephone for cocaine and that he tried to sell the victim's car. Thus, the trial court did not err in instructing the jury on the aggravating circumstance, and it did not err in finding in its sentencing order that that aggravating circumstance existed. Accordingly, we find no error here.
 VII.
Bryant contends that Alabama's use of the electric chair in carrying out the death penalty does not meet constitutional standards. He specifically argues that Alabama uses faulty and unreliable equipment and unqualified personnel, and that Alabama's electric chair results in prolonged and torturous electrocutions.
It is well settled that death by electrocution does not constitute cruel and unusual punishment in violation of the Eighth Amendment. See Lindsey v. Smith, 820 F.2d 1137
(11th Cir.1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327,103 L.Ed.2d 595 (1989); Sullivan v. Dugger, 721 F.2d 719
(11th Cir.1983); Lowenfield v. Phelps, 817 F.2d 285
(5th Cir.1987), aff'd, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568
(1988); Stephens v. State, 580 So.2d 11
(Ala.Cr.App. 1990), aff'd, 580 So.2d 26 (Ala.), cert. denied,502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); Thompson v.State, 542 So.2d 1286 (Ala.Cr.App. 1988), aff'd,542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208,107 L.Ed.2d 161 (1989); Jackson v. State, 516 So.2d 726
(Ala.Cr.App. 1985), remanded on other grounds, 516 So.2d 768
(Ala. 1986).
Moreover Bryant's claims that Alabama's electric chair is antiquated and inadequate and that it results in prolonged and torturous executions have been previously addressed and decided adversely to him. See Thomas v. Jones, 742 F.Supp. 598,602 (S.D.Ala.1990); Ritter v. Smith, 568 F.Supp. 1499
(S.D.Ala.1983), aff'd in relevant part, rev'd in unrelated part,726 F.2d 1505, 1519 (11th Cir.), cert. denied, 469 U.S. 869,105 S.Ct. 218, 83 L.Ed.2d 148 (1984); McNair v. State,706 So.2d 828 (Ala.Cr.App. 1997), cert. denied, *Page 722 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998); Jackson,516 So.2d at 738. Accordingly, there is no error as to this matter.
 VIII.
Bryant also contends that § 15-12-21(d), Ala. Code 1975, which limits court-appointed attorneys' fees to $1,000 for out-of-court work in each phase of a capital murder trial, is unconstitutional. Specifically, he argues that this limitation on compensation violates the separation-of-powers doctrine; that it constitutes a taking without just compensation; that it deprives an indigent capital defendant of effective assistance of counsel; and that it denies the indigent defendant equal protection of the law. These claims were not presented in the trial court; thus, our review is for plain error. Rule 45A, Ala. R.App.P.
Bryant's claims have been previously addressed and rejected by this court and by the Alabama Supreme Court. See, e.g., Exparte Smith, 698 So.2d 219 (Ala.), cert. denied,522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997); Ex parteGrayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865,106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Samra v. State,771 So.2d 1108 (Ala.Cr.App. 1999); Hyde v. State,778 So.2d 199 (Ala.Cr.App. 1998); Barbour v. State,673 So.2d 461 (Ala.Cr.App. 1994), aff'd, 673 So.2d 473 (Ala. 1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074
(1996); May v. State, 672 So.2d 1307 (Ala.Cr.App. 1993), writ quashed, 672 So.2d 1310 (Ala. 1995);Johnson v. State, 620 So.2d 679 (Ala.Cr.App. 1992), rev'd on other grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905,114 S.Ct. 285, 126 L.Ed.2d 235 (1993); and Smith v.State, 581 So.2d 497 (Ala.Cr.App. 1990), rev'd on other grounds, 581 So.2d 531 (Ala. 1991), aff'd on return to remand,698 So.2d 189 (Ala.Cr.App. 1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Accordingly, there is no plain error as to this matter.
 IX.
Bryant also contends that the cumulative effect of all the alleged errors violated his rights to due process and to a fair trial. We do not agree. We have reviewed each and every allegation of error as well as the cumulative effect of those alleged errors and find that the cumulative effect of these alleged errors does not warrant a reversal. Moreover, Bryant's arguments asserting these claimed errors have now been determined to be without merit. Because no single instance of alleged error constituted reversible error, we will not consider the cumulative effect to be any greater. See Boyd v.State, 715 So.2d 825, 851 (Ala.Cr.App. 1997), aff'd,715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416,142 L.Ed.2d 338 (1998).
 X.
In accordance with Rule 45A, Ala. R.App.P., we have examined the record for any plain error with respect to Bryant's capital murder conviction and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phase of the trial.
We have also reviewed Bryant's sentence in accordance with §13A-5-51, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Bryant's capital murder conviction, we must review the propriety of the death sentence. This review includes our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and *Page 723 
mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Bryant of the capital offense charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and-46, Ala. Code 1975. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended that Bryant be sentenced to death by electrocution by a vote of 11-1.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala. Code 1975, to aid it in determining whether it would sentence Bryant to life imprisonment without parole or to death as recommended by the jury. The trial court ordered and received a written pre-sentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala. Code 1975, as well as written findings of fact summarizing the offense and Bryant's participation in the offense.
In its findings of fact, the trial court found the existence of two statutory aggravating circumstances: (1) that the murder was committed while Bryant was engaged in the commission of, or an attempt to commit, or flight after committing a kidnapping, see § 13A-5-49(4), Ala. Code 1975; and (2) that the capital offense was committed for pecuniary gain, see § 13A-5-49(6), Ala. Code 1975. The trial court found that no statutory mitigating circumstances existed. The trial court also heard testimony regarding Bryant's character or record and any of the circumstances of the offense that Bryant offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala. Code 1975. In this regard, the trial court found that the following evidence was mitigating: (1) Bryant's parents were alcoholics; (2) Bryant did not resist arrest for Hollis's murder; he has been a cooperative prisoner since his arrest for capital murder; and while incarcerated for Hollis's murder, he assisted a female jailer who was attacked by other inmates; and (3) Bryant's "mental or emotional disturbances were aggravated during his childhood by the interactions of family members towards him and each other and that his drug abuse was a result of his mental or emotional disturbance." (R. 431.)
The trial court's sentencing order reflects that after considering all the evidence presented, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstances against the mitigating circumstances in the case, the trial court found that the aggravating circumstances outweighed *Page 724 
the mitigating circumstances. Accordingly, the trial court sentenced Bryant to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.
Bryant was convicted of the offenses of murder committed during a kidnapping in the first degree. This offense is defined by statute as a capital offense. See § 13A-5-40(1), Ala. Code 1975. We take judicial notice that other kidnapping/murders have been punished capitally throughout the state. See, e.g.,hoggins v. State, 771 So.2d 1070 (Ala.Cr.App. 1999);Boyd v. State, 715 So.2d 825 (Ala.Cr.App. 1997), aff'd,715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416,142 L.Ed.2d 338 (1998); Dallas v. State, 711 So.2d 1101
(Ala.Cr.App. 1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied,525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998);Trawick v. State, 698 So.2d 151 (Ala.Cr.App. 1995), aff'd,698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000,118 S.Ct. 568, 139 L.Ed.2d 408 (1997); Jenkins v. State,627 So.2d 1034 (Ala.Cr.App. 1992), aff'd, 627 So.2d 1054 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63
(1994).
After carefully reviewing the record of the guilt phase and the sentencing phase of Bryant's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstances outweigh the mitigating circumstances, and that death is the appropriate sentence in this case. Considering Bryant and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
For the reasons stated above, Bryant's conviction and sentence of death are affirmed.
AFFIRMED.
McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.
[1] The State's evidence in Hubbard tended to show that the defendant shot the victim, a woman he lived with, three times. When the defendant was "booked" following his arrest for the murder, he had in his possession the victim's watch and a number of checks made payable to the victim.